# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:12cv186
# [3:10cr124-2]

| | |
|---|---|
| ERICA L. FLOOD, | ) |
| Petitioner, | ) |
| Vs. | ) MEMORANDUM OF |
| | ) DECISION AND ORDER |
| UNITED STATES OF AMERICA, | ) |
| Respondent. | ) |

**THIS MATTER** is before the Court on petitioner's Motion under 28, United States Code, Section 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (#1). After an initial screening, the court determined that plaintiff had asserted two claims, as follows:

(1) that there was prosecutorial misconduct for a failure to abide by an alleged *nol pros* agreement; and

(2) that she received ineffective assistance of counsel in preparing for the plea and sentencing hearings.

See Order (#2).

On June 25, 2012, respondent filed its Response (#6) and Motion for Summary Judgment (#7). That same day, this court entered an Order advising petitioner of her right to respond, instructing her as to the manner of a response, and providing her up to and inclusive of July 13, 2012, to respond, all in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). A response was received by the court on July 18, 2012, indicating that petitioner had delivered her response to prison authorities on July 12, 2012; as petitioner

-1-

timely delivered her response to prison authorities within the time allowed, the court deems such response timely filed and has fully considered petitioner's responsive arguments.

It now appearing that such motion is ripe for consideration, the court enters the following findings, conclusions, and Order granting the government's Motion for Summary Judgment and denying petitioner's Motion under 28, United States Code, Section 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.

## FINDINGS AND CONCLUSIONS

**I.     The Criminal Action**

Petitioner agreed as part of the plea agreement and again at sentencing that the offense conduct set forth in the Presentence Report (hereinafter "PSR") established the factual basis for her guilty plea. See United States v. Flood, 3:10cr124-2 (hereinafter "CR") (#130, at ¶ 15); CR (#330) (Sent. Hrg. Tr.) at 4. In its response, the respondent accurately summarizes facts relevant to the instant petition. The following summary of the factual basis is drawn from the final PSR and that summary, unless otherwise noted.

**A.     Offense Conduct**

In late 2005 and continuing through approximately December 2007, a number of related mortgage fraud "cells" began perpetrating a scheme that targeted certain neighborhoods in Charlotte and nearby Waxhaw, North Carolina. The cells were composed of promoters, facilitators, mortgage brokers, real estate agents, attorneys, bank insiders, straw buyers, and others. The targeted neighborhoods were affluent ones, with homes in the $1 million range, and most featured new construction.

Petitioner was a leader of one of these mortgage fraud cells, working at two entities known as JP Mortgage and FocusOne Financial, and owning her own company, "The Kashmir Group," which she used to receive and launder the proceeds of mortgage fraud

transactions. As a promoter, she engaged in whatever activities were necessary for a given transaction to be accomplished. One example, cited in the PSR, involved her bribing a fellow worker at FocusOne to falsely notarize mortgage loan documents for straw buyers who were in California rather than in North Carolina for the closings, as the notarizations falsely indicated. She also worked with another co-conspirator to provide false verifications of deposits to show that straw buyers had substantial funds in bank accounts. Petitioner also arranged for false bank statements to be prepared as necessary, and would include false information about buyers' places of employment, income, and other relevant information. Petitioner also laundered large amounts of mortgage fraud proceeds through her company, The Kashmir Group, and paid kickbacks to several of her co-conspirators.

Petitioner also engaged in an additional scheme with some of the other members of the mortgage fraud scheme in which she provided bribes to bank employees to supply false letters of credit or guarantees. Landrick A.O. McClain, the owner of Credit Risk Re Limited, was the leader and primary financier of this scheme. McClain and others would seek out businesses in need of financing or financial guarantees. McClain would offer to supply such businesses with a financial guarantee or letter of credit from a prominent financial institution, such as Bank of America or Wachovia Bank. McClain attempted to charge the victim businesses for such letters, generally requesting several hundred thousand dollars in exchange for a letter – representing that such money would be "collateral" for the letter. Unbeknownst to the victims, the letters were bogus, and were obtained only by bribing an employee of the relevant financial institution. McClain recruited petitioner to bribe and recruit bank employees to provide such bogus letters, and she did so.

    **B.    Initial Arrest, Cooperation with the Government, and Non-Attribution Agreement**

Relevant to petitioner's contention of prosecutorial misconduct, the bank bribery scheme was uncovered when an honest bank employee solicited by petitioner called the FBI to report the offered bribe. When petitioner offered the cash bribe to the employee at their pre-arranged meeting in the bank parking lot on December 5, 2007, federal agents arrested petitioner. She then admitted that she had been working for McClain to bribe bank employees to provide letters of credit. She confessed that day that she had provided such bribes to, and was aware that McClain had bribed, co-conspirator Vic Henson and two others.

Shortly after her arrest and initial interview with law enforcement agents, petitioner retained Richard A. Culler, Esquire, to represent her. Richard A. Culler Affidavit (hereinafter "Culler Aff.") (#6, Exh. 1, at ¶ 4). Mr. Culler and the prosecutor, Assistant United States Attorney Kurt Meyers, agreed that an oral non-attribution agreement was in existence effective December 7, 2007. Id., at ¶ 5. AUSA Meyers told Mr. Culler that the Government wanted petitioner to assist the Government with the investigation and other matters related to her employment in the mortgage industry. Id.

On December 20, 2007, petitioner and Mr. Culler signed an agreement with the government – "Agreement Requiring Truthful Disclosure" (also called a "non-attribution agreement") – in which Petitioner agreed "to provide to the United States complete and truthful information about all criminal activity within her knowledge." See Motion to Vacate (#1), at 19. In exchange, the government agreed that none of her statements made pursuant to that agreement could be used against her in the government's case-in-chief in any subsequent trial of petitioner, with certain exceptions. Id. Importantly, the agreement also specifically stated that the government remained free "to pursue any investigative leads suggested by any statements made or other information provided by [petitioner] and to use

the evidence or information obtained therefrom against [her] in any manner." Id.

Thereafter, petitioner and Mr. Culler met with government agents on December 20, 2007, to be debriefed. Culler Aff. at ¶ 8; Affidavit of AUSA Kurt Meyers (hereinafter "Meyers Aff.")(#6, Exh. 2, at ¶ 3). Additionally, petitioner and Mr. Culler met with the agents and AUSA Meyer on at least two other occasions, on February 19 and April 2, 2008, and before each meeting Mr. Culler discussed with her the elements of the offenses the government was investigating and the importance of her being entirely truthful. Meyers Aff., at ¶ 9. He also reviewed the non-attribution agreement with her. Id.

The government readily concedes that petitioner provided useful information about the bank bribery scheme and co-conspirators involved in that scheme, including providing the agents with documents and making pro-active contact with co-conspirators. Id., at ¶ 4. At an early stage, the government drafted (but did not sign) a possible plea agreement, which petitioner and Mr. Culler signed on January 4, 2008. Motion to Vacate (#1), at 21-30; Meyers Aff., at ¶ 5. However, when Petitioner was arrested on the bank bribery scheme, she was already well known to federal law enforcement agents who, unbeknownst to her, had been working the mortgage fraud scheme. Cr. (# 330, at 12); Meyers Aff., at ¶ 2. The agents who had been working the mortgage fraud scheme were the same agents who participated in the interviews of petitioner in December 2007 and the first few months of 2008. Id.

Unlike the bank bribery scheme, petitioner was not so forthcoming about the mortgage fraud scheme, and refused to cooperate or to provide truthful information to the Government about that scheme, despite several meetings in which the agents and prosecutor informed her that they knew she had information that she was not telling them, and that the information that she was providing was false. Meyers Aff., at ¶ 5. Mr. Culler, in his affidavit, avers that after the first meeting among petitioner, the agents, and AUSA Meyers,

the AUSA made it clear that he did not believe that petitioner was being completely truthful about her involvement and was minimizing her role, and she would not get a benefit if she did not tell the complete truth. Culler Aff., at ¶ 10. Mr. Culler also avers that he tried to get a more detailed idea of what the government believed petitioner was withholding, but the AUSA declined to provide specifics. Id. Mr. Culler discussed this matter several times with petitioner in February and April 2008 in an effort to make sure she understood the situation and the importance of being completely truthful, but petitioner insisted that she did not commit any acts beyond those she had told the government about, and that she could not think of what other criminal information the government could be seeking. Id.

Because the government perceived that petitioner was not being completely truthful and was withholding information about the larger mortgage fraud scheme, the government informed petitioner and Mr. Culler that it was not going to enter into the proposed plea agreement (discussed above), nor was it going to debrief her any further or otherwise seek her cooperation, and it informed her that she was likely to be indicted at some future date on both the mortgage fraud and bank bribery schemes. Meyers Aff. at ¶ 6. During the final meeting with petitioner and Mr. Culler, AUSA Meyers expressed his frustration with her withholding information and not being truthful, then grabbed the plea agreement which had not been signed by the government and tore it up in front of her. Culler Aff., at ¶ 11. Mr. Culler avers:

> [a]t that point, Mr. Meyers made it clear that any agreements on the table at that stage of the investigation were officially null and void.

Id.

There was no further interaction between the government and petitioner until the grand jury returned the indictment in this case more than two years later. Meyers Aff., at ¶

7.

### C. The Indictment and Petitioner's Guilty Pleas

On June 15, 2010, the Grand Jury returned a 30-count indictment against petitioner and nine others, in which petitioner was charged with a conspiracy to commit mortgage fraud, four substantive counts of bank fraud related to that conspiracy, a conspiracy to commit money laundering, and two substantive counts of money laundering. CR (#1). Petitioner was not named as a defendant in any of the counts involving the bank bribery scheme: Count 23 (the bank bribery conspiracy); Counts 24 through 29 (the substantive bank bribery counts); and Count 30 (money laundering of the bribery proceeds). Id., at 33-37.

Petitioner had her initial appearance on June 16, 2010, and five days later the Court appointed Victoria Jayne to represent her. See CR. Petitioner eventually participated in further interview sessions with the Government in late 2010 in which, contrary to her sessions in late 2007 and early 2008, she was truthful and forthcoming about the mortgage fraud scheme and her own criminal activities. Meyers Aff. at ¶ 7. The government, petitioner, and Ms. Jayne negotiated and signed a plea agreement on January 3, 2011, in which petitioner agreed to plead guilty to Count One (the mortgage fraud conspiracy), Count Five (one of the substantive counts of bank fraud related to the mortgage fraud scheme), and Count Fifteen (the money laundering conspiracy). CR (#130).

Petitioner entered her guilty pleas before Honorable David C. Keesler, United States Magistrate Judge, on January 4, 2011. CR (#329). During the Rule 11 hearing, the prosecutor explained the nature of the three counts to which Petitioner was pleading guilty, id. at 4-5, and petitioner, who had sworn to tell the truth at the Rule 11 proceeding, id. at 2, told Judge Keesler that she had been over these charges carefully with Ms. Jayne, and that she believed that she understood the charges and the maximum penalties. Id., at 6. Petitioner admitted she

was guilty of these three crimes. Id., at 9. When the court questioned petitioner about her understanding of the plea agreement, she responded that she had been over the agreement carefully with Ms. Jayne and that she believed she understood the terms of the agreement and agreed with them. Id., at 12. She testified that she had had enough time to discuss any possible defenses with Ms. Jayne, that she was satisfied with Ms. Jayne's services, and then she added:

> [Ms. Jayne has] been representing me very well, and I'm very, um, glad to have Ms. Jayne as far as my attorney on this case. That's the only thing that I can say.

Id., at 13. Petitioner told the court that she had no questions or other statements that she wanted to make. Id. Ms. Jayne told the court that she had reviewed each of the terms of the plea agreement with petitioner and that she believed petitioner understood those terms and knew what she was doing. Id., at 14. The court then accepted the guilty pleas, finding that petitioner understood the charges and had entered those pleas knowingly and voluntarily. Id. at 15.

### D. Sentencing

The Final PSR calculated the base offense level for the three grouped offenses as 7, and added: 18 levels for a loss amount more than $2,500,000 but less than $7,000,000; 2 levels for a conviction under 18 U.S.C. § 1956; 4 levels for petitioner's role in the offense as a leader in the mortgage fraud conspiracy; and 2 levels for her abuse of a position of trust. The offense level was then reduced by 3 based on her acceptance of responsibility, resulting in a total offense level of 30. CR (#212, at 9-10). Combined with a Criminal History Category I, the recommended advisory sentencing range was 97 to 121 months. Id. at 14. Ms. Jayne filed objections to the Draft PSR on behalf of Petitioner. CR (#192).

After the Final PSR issued, Ms. Jayne also filed a sealed sentencing memorandum in

which she moved for a "departure from the applicable Guideline Range," and discussed the sentencing factors of 18 U.S.C. § 3553(a) and how those should apply in such case. CR (# 221). In that memorandum, she discussed petitioner's initial cooperation with the government following her 2007 arrest, and then in November 2010 following her indictment. Id., at 2-3. Ms. Jayne discussed Petitioner's family circumstances, including her being a single parent of a 12-year-old daughter, her responsibility for caring for an elderly mother, and her severely ill ex-husband. Id., at 3. Ms. Jayne concluded by asking the court to impose a sentence, well below the advisory range, of house arrest. Id. Ms. Jayne attached 16 pages of letters and emails on behalf of petitioner. CR (#221-2).

The day before sentencing, the government filed a downward departure motion pursuant to U.S.S.G. § 5K1.1. CR (#232). The government described petitioner's cooperation as "complicated," and summarized her initial cooperation following her December 2007 arrest, which was "was extremely helpful to the bank bribery investigation for which she had been arrested, but [petitioner] proved herself unreliable and not credible regarding the mortgage fraud investigation." Id., at 2-3. The motion specifically cited petitioner's making recorded telephone calls and her providing lead information as examples of her cooperation in the bribery scheme investigation, but stated that she was not similarly forthcoming as to the mortgage fraud investigation. Id., at 3. The relationship deteriorated to the point that the government ceased working with petitioner after several attempts to obtain complete cooperation failed. Id. After her indictment in June 2010 and her guilty plea in January 2011, petitioner expressed a renewed interest in cooperating and the government debriefed her, but by that time only co-defendant Sabrena Mobley remained for trial. Id. The government represented that the information petitioner provided was corroborated by other witnesses and documents, and the government believed that petitioner could have been a trial

−9−

witness against Mobley, "albeit one subject to vigorous cross-examination based on her prior inconsistent statements." Id. Mobley pled guilty after petitioner did, and the government believed that petitioner's cooperation might have at least partly induced that plea, and asked the court to give her credit for that. Id. The government discussed what it considered to be examples of denial and lack of candor continuing through petitioner's objections to the PSR. Id. The government concluded that ultimately Petitioner was "a witness with limited credibility who provided excellent lead information in the bank bribery investigation, and the possibility of additional corroborating testimony against" one co-conspirator, and asked the court to grant a 25% downward departure. Id., at 4. This would result in an advisory range of 63-78 months. Id.

At the sentencing hearing, petitioner confirmed that the answers she gave during her Rule 11 hearing were true and correct, and that her answers would be the same if the court were to ask her now at sentencing. CR (#330, at 2). She confirmed that she still wanted to go forward with her guilty plea. Id., at 3. She told the court that she had discussed the PSR with Ms. Jayne and believed that she understood it, and Ms. Jayne confirmed this. Id., at 4-5. In discussing the government's downward departure motion, the prosecutor recounted the history of petitioner's arrest in December 2007 and her cooperation about that scheme both immediately upon arrest and after she had retained Mr. Culler. Id., at 11-12. In contrast, however, the prosecutor informed the court that petitioner did not provide the same level of cooperation regarding the mortgage fraud investigation, that she "said some things that just weren't right," and that the government

> broke off working with [petitioner], even though she had been valuable for the bank bribery, someone has to be truthful full bore in order for us to rely on the information because what we're doing is very serious work.

Id., at 13. The court was also informed that after her indictment, and work done by Ms.

Jayne and her investigator, that Ms. Jayne had informed the government that petitioner was willing to be debriefed about the mortgage fraud, and the government conducted such a session, but petitioner's cooperation at that point could only assist against Mobley, a straw buyer in a mortgage fraud scheme, who had not yet plead guilty. Id., at 13-14. The court was further informed that the information petitioner did finally provide was corroborated and the government believed it to be truthful. Id., at 14. After hearing from Ms. Jayne regarding the government's motion, this court observed that the prosecutor's description of petitioner's cooperation "was a very even-handed report of that, and there was one of those situations where there was a breakdown and it was helpful on one and not on the other." Id., at 16.

Ms. Jayne then informed the court that "we're requesting a variance." Id., at 17. As grounds for such a variance, she cited the information contained in the PSR about petitioner's life, as well as the letters she had submitted, and then discussed at some length Petitioner's family circumstances, her desire to make extra money to support her daughter and mother, and her ex-husband, who was seriously ill with leukemia. Id., at 17-23. Ms. Jayne asked the court to consider house arrest or "some sort of community punishment," particularly citing petitioner's concern about her daughter, for whom she was the sole caretaker and provider. Id., at 23.

This court, after discussing the extent and nature of petitioner's cooperation with the government, noted that she had a 12-year-old child, but stated that this was "not a home detention kind of case." Id. at 25. Petitioner was afforded an opportunity to speak, and she acknowledged the mistake she had made and the difficulty of having to look at her daughter every day knowing she had made such a mistake. Id., at 34. The court granted the government's departure motion, denied the defendant's request for variance, and imposed a total term of 63 months, at the bottom of the new advisory range. Id., at 35.

## II. Petitioner's Prosecutorial Misconduct Claim

Petitioner has asserted a claim based on prosecutorial misconduct. See Motion to Vacate (#1), at 17. In support of such contention, petitioner asserts that the government: (1) breached a 2007-2008 agreement not to prosecute; and (2) failed to make a downward departure motion. Id.

To prevail on a claim of prosecutorial misconduct, a defendant must show: (1) the prosecutor's conduct was improper; and (2) the conduct prejudicially affected her substantial rights so as to deprive her of a fair proceeding. See United States v. Golding, 168 F.3d 700, 702 (4th Cir. 1999).

In support of the first subcontention, petitioner has annexed to her motion a copy of the December 18, 2007, "Agreement Requiring Truthful Disclosure." See Motion to Vacate, Exh. A, at 19-20. Such agreement provides no support for her contention: such agreement contains no promise not to prosecute her, but specifically provides *for* the possibility of future prosecution. Further, the document contains no promise whatsoever of immunity or of a declination of prosecution, but only prohibits the government from using any of petitioner's statements against her at trial in its case-in-chief. Even the proposed plea agreement that petitioner and Mr. Culler signed – and Mr. Meyer ripped up after petitioner failed to provide truthful information in January 2008 – was the antithesis of a non-prosecution agreement, as it provided that petitioner would plead guilty to a 30-year felony offense. Thus, petitioner's claim of prosecutorial misconduct based on a *nol pros* agreement is wholly without merit as it lacks a plausible factual basis and will be dismissed with prejudice.

As to the second subcontention, to wit, that the government engaged in prosecutorial misconduct because it failed to make a motion for downward departure, the record is clear

that the government in fact filed a "Motion for Downward Departure" seeking a significant departure, which the court granted as discussed above. See CR, "Motion for a Downward Departure" (#232).[1] While the discretion to make such a motion is vested solely in the United States Attorney, and would not be a basis for a viable claim of prosecutorial misconduct in these circumstances, the government's request for a downward departure resulted in a sentence of 63 months, rather than a possible sentence of between 97-121 months as suggested by the advisory Sentencing Guidelines. See Sentencing Transcript (#330), at p. 10. As this court noted during the sentencing proceeding, the government dealt with petitioner in an even-handed manner in the criminal proceeding. Thus, respondent has fulfilled its obligations to petitioner and she has fairly received the benefit of her bargain with the government.

Finding that there is no support for a claim of prosecutorial misconduct, such subcontention will be dismissed with prejudice.

## III. Petitioner's Ineffective Assistance of Counsel Claim

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel. See U.S. Const., Art. VI. To prevail on a § 2255 claim of ineffective assistance of counsel, a petitioner has the burden of establishing both (1) that defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) that the petitioner was prejudiced thereby, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688,

---

[1] The court has lifted the seal as to such document only to the extent necessary to address contentions raised by petitioner.

694 (1984).

As to the deficiency prong, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Id., at 689. A reviewing court must avoid the temptation of hindsight and instead "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." Strickland, 466 U.S. at 689.

To establish the second prong of the Strickland analysis, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694. The likelihood of a different result must be "substantial, not just conceivable" for a court to find that confidence in the outcome is undermined. Harrington v. Richter, ___U.S.___, 131 S.Ct. 770, 792 (2011). In the sentencing context, a petitioner must demonstrate a "reasonable probability" that her sentence would have been more lenient had counsel's performance not been deficient. Royal v. Taylor, 188 F.3d 239, 249 (4th Cir. 1999). If a petitioner fails to meet her burden of demonstrating prejudice, a "reviewing court need not consider the performance prong," and *vice versa*. Fields v. Attorney Gen., 956 F.2d 1290, 1297 (4th Cir.1992). Thus, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697. In this action, there is absolutely no evidence in the record that either Mr. Culler or Ms. Jayne were ineffective or that petitioner suffered any prejudice as a result of either attorneys' actions.

### A. Mr. Culler

While petitioner alleges that Mr. Culler misled her and made false promises, she fails to specify what those false promises might have been. She also states that Mr. Culler failed to attend some of the meetings with the FBI agents. As AUSA Meyers notes in his attached affidavit, once petitioner had signed the non-attribution agreement and had begun to cooperate with the government, he did not attend most of the meetings between the agents and petitioner, and he believes that Mr. Culler, too, might not have been present for every one of those meetings. Myers Aff., at ¶ 8. As AUSA Meyers notes, however, in his experience it is not unusual for attorneys representing cooperating witnesses to consent to agents' continuing debriefings of their clients so long as the agents understand that any such meetings must cease if the client expresses a desire to consult with her attorney or to have him present. Id. Petitioner has pointed to no debriefing or interview where she requested that counsel be present and such request was denied. Petitioner fails to demonstrate that Mr. Culler's actions fell below prevailing professional norms in this regard.

As to the prejudice prong, petitioner's attempts to recast her own lack of candor or truthfulness with agents as being the fault of Mr. Culler is insufficient to show prejudice. Further, petitioner's contention that her attorney should not have allowed her to sign the non-attribution agreement because that "[i]nformation that she provided to set up other peers and or associates for successful indictments on behalf of the government was used against defendant," Motion to Vacate (#1), at 13, is without a plausible basis as the information and leads that petitioner provided as to the bank bribery scheme in no way prejudiced her inasmuch as the government did not charge petitioner with any bank bribery offenses.

Finally, petitioner contends as to Mr. Culler that she was prejudice by his failure to hold the "government accountable" for its promises in the proposed Plea Agreement, which

she signed, but the government tore up without signing as discussed above. Id.

> It is well-established that the interpretation of plea agreements is rooted in contract law, and that "each party should receive the benefit of its bargain." United States v. Ringling, 988 F.2d 504, 506 (4th Cir.1993). A central tenet of contract law is that no party is obligated to provide more than is specified in the agreement itself. Accordingly, in enforcing plea agreements, the government is held only to those promises that it actually made to the defendant. See United States v. Fentress, 792 F.2d 461, 464 (4th Cir.1986). This court has previously noted that the government's duty in carrying out its obligations under a plea agreement is no greater than that of "fidelity to the agreement." Id. at 464.

United States v. Peglera, 33 F.3d 412, 413 (4th Cir. 1994). Thus, if such aborted plea agreement was considered to be formed at the time petitioner and her counsel signed it, even in the absence of a signature by the government, petitioner's unrebutted lack of candor with the government was a sufficient breach by petitioner to make any corresponding obligation thereunder a nullity. What is clear, however, is that despite petitioner's lack of providing a full and truthful disclosure, the government lived up to its obligations in the non-attribution agreement by not charging petitioner with any bank bribery offenses and in moving for a downward departure at sentencing. Thus, even if Mr. Culler had been in a position to "hold the government accountable" – some two years after his representation had ended, on a plea agreement which was never executed by the government, on a bill of information that was never returned – it appears that there was absolutely no prejudice as the government fully recompensed petitioner for her cooperation and fulfilled its promises to her inasmuch as it never charged her with bank bribery offenses and moved for a substantial downward departure, leaving nothing for Mr. Culler to "enforce."

Finding no merit to petitioner's claim of ineffective assistance of counsel as to either Strickland prong, the court will dismiss with prejudice petitioner's contention of ineffective

assistance of counsel as to Mr. Culler.[2]

**B.     Ms. Jayne**

Petitioner also claims that Ms. Jayne was ineffective because she failed to effectively and efficiently explain the plea agreement and its consequences to her, and that she pressured her into signing an agreement that she did not fully understand. Motion to Vacate (#1), at 13. She claims that her counsel failed to explain the charges or indictment to her, and that she did not research or display knowledge of the mortgage industry sufficiently to represent her properly. Id.

Plaintiff's claims that Ms. Jayne failed to understand the mortgage industry are merely speculative. Not only is Ms. Jayne an experienced attorney – routinely appointed by the judges of this court to work on very complex white collar cases – it is undisputed that Ms. Jayne and her investigator located more than 60,000 pages of relevant discovery, spent significant time going over documents and video with petitioner, and spent substantial time listening to petitioner describe her training and duties. See Affidavit of Victoria Jayne (hereinafter "Jayne Aff.") (#6, Exh. 3, at ¶ 3). Review of the CJA 20s submitted by counsel as well as interim requests for compensation reveals that counsel spent substantial time on this case and successfully applied for the assistance of an expert.

As to petitioner's allegation that Ms. Jayne failed to explain the plea agreement and its consequences to her, Ms. Jayne states in her affidavit that she "did urge her to enter into the plea agreement after spending considerable time convincing AUSA Meyers to acknowledge her [petitioner's] assistance," id. at ¶ 4, and that from the substantial amount

---

[2] Because Mr. Culler did not represent her at the time she finally entered into a guilty plea in the underlying criminal matter or when she was indicted, petitioner's allegations of ineffective assistance of counsel during the plea following indictment are more properly considered as occurring during the period of Ms. Jayne's representation, which will be herein addressed.

-17-

of time she spent listening to petitioner, it became clear that petitioner's "level of knowledge made it impossible to defend her actions which, as she admitted, included some forgeries, bribery of bank officials and preparing false documents." Id., at ¶ 6. Further, petitioner's allegations are rebutted by her own sworn testimony at the Rule 11 hearing and reaffirmed at the sentencing hearing conducted by this court. Regardless of counsel's advice, which this court has no reason to question, petitioner cannot show prejudice because careful inquiry was made by the court both at the Rule 11 proceeding and at sentencing: during the Rule 11 hearing petitioner averred that she understood the terms of the plea agreement, the nature of the charges to which she was pleading guilty, and the maximum punishment, and then reaffirmed those answers before this court. Petitioner cannot demonstrate prejudice in counsel's representation.

Finally, in an equally conclusory fashion, petitioner alleges that "information placed in front of the Judge was not truthful and factual thereby allowing the Judge to make decisions based on inaccurate information and false presumptions." Motion to Vacate (#1), at 13. Petitioner fails to detail the information which was falsely presented. As the transcript of the sentencing hearing reveals, the court gave petitioner the opportunity to speak before it imposed sentence and petitioner made no mention of any such incorrect information or inaccurate presumptions. The only specific complaints petitioner makes as to Ms. Jayne's performance at sentencing involve an alleged failure to require the government to move for a downward departure for substantial assistance, and a failure to move for a downward variance or departure based on family circumstances. Id., at 13, 15. As discussed at some length above, each of these allegations is without a factual basis as the government *did* move for a downward departure and Ms. Jayne *did* file a motion for variance and then argued for a variance at the hearing. In her motion, Ms. Jayne wrote, as follows:

> The Court can consider the unique circumstances of a Defendant in fashioning the appropriate sentence. In this case Ms. Flood is a single mother of a 12 year old daughter with the added burden of an elderly mother and severely ill ex-husband. Ms. Flood has provided financial assistance frequently to her mother and ex-husband and is the primary provider for her daughter. With only a High School Diploma, she worked her way into the position of "loan officer" with Focuse One [*sic*] Financial. As a loan officer she made approximately $2700.00 a month to support herself, her child and assist her mother. When Liz McPhal walked into her life, she succumbed to the enticement of extra money. Ms. Flood described how she began to emulate McPhal in her dress and style and readily offered "The Kashmr [*sic*] Group" account to facilitate the laundering of the illegal gains. Enamored with McPaul [*sic*] and enticed by the promise of income influenced Ms. Flood to become the conduit for the illegal actions of herself, McPhal and others.

Sentencing Memorandum (#221), at 3. At the sentencing hearing, Ms. Jayne argued as follows:

> So, Your Honor, we just ask for an additional variance in addition to what the government has already recommended.
> Ms. Flood recognizes that she may certainly serve active time. She is concerned about her daughter. She is the sole provider, caretaker for her daughter. If Your Honor would consider house arrest for her, consider some sort of community punishment, she would certainly abide by all terms as she has done for the past -- now it's been over two-and-a-half years, it's been three-and-a-half years since this all originally came up.

Sentencing Transcript (#330), at 23.

Finding no merit to petitioner's claim of ineffective assistance of counsel as to either Strickland prong, the court will dismiss with prejudice petitioner's contention of ineffective assistance of counsel as to Ms. Jayne.

**ORDER**

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion under 28, United States Code, Section 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (#1) is **DENIED**;

2. the government's Motion for Summary Judgment is **GRANTED**; and

3. this civil action is **DISMISSED** with prejudice.

**Denial of Certificate of Appealability**

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this court declines to issue a certificate of appealability as petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484–85 (2000) (in order to satisfy § 2253(c) when the court denies relief on procedural grounds, a petitioner must demonstrate both that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right).

Signed: August 7, 2012

Max O. Cogburn Jr.
United States District Judge